## O'DONOGHUE v. UNITED STATES.*

No. 729.   Argued April 12, 1933.—Decided May 29, 1933.

---

* Together with No. 730, *Hitz* v. *United States.*

518

*Messrs. John W. Davis* and *John S. Flannery,* with whom *Messrs. George E. Hamilton* and *Daniel W. O'Donoghue, Jr.,* were on the brief, for plaintiffs.

522

*Solicitor General Thacher*, with whom *Messrs. Wm. W. Scott, Robert P. Reeder, Erwin N. Griswold,* and *H. Brian Holland* were on the brief, for the United States, in this case and the case next following.

524

Mr. Justice Sutherland delivered the opinion of the Court.

These cases are here on certificates from the Court of Claims. They involve the same questions, were argued together at the bar, and may well be disposed of by the same opinion.

Daniel W. O'Donoghue is an associate justice of the Supreme Court of the District of Columbia, having been duly appointed to that position by the President, by and with the advice and consent of the Senate. He duly qualified as such justice on February 29, 1932, and has ever since been engaged in the performance of the duties of the office. At the time of his appointment and entry upon his duties, his salary was fixed by act of Congress (c. 6, 44 Stat. 919) at the rate of $10,000 per year, which was paid to him until June 30, 1932.

William Hitz is an associate justice of the Court of Appeals of the District of Columbia, having been appointed on December 5, 1930, by the President, and later confirmed by the Senate. On February 13, 1931, he duly qualified as such associate justice and has ever since been engaged in performing the duties of his office. By the act of Congress already referred to, his salary was fixed at the rate of $12,500 per year. This amount he received until June 30, 1932.

By the Legislative Appropriation Act of June 30, 1932, (c. 314, 47 Stat. 382, 401) Congress provided as follows:

"Sec. 105. During the fiscal year ending June 30, 1933—

.    .    .    .    .

"(d) In the case of the following persons the rate of compensation is reduced as follows: If more than $1,000 per annum but less than $10,000 per annum, 8⅓ per centum; if $10,000 per annum or more, but less than $12,000 per annum, 10 per centum; if $12,000 per annum or more, but less than $15,000 per annum, 12 per centum; if

$15,000 per annum or more, but less than $20,000 per annum, 15 per centum; if $20,000 per annum or more, 20 per centum."

"Sec. 106. During the fiscal year ending June 30, 1933, the retired pay of all judges (except judges whose compensation may not, under the Constitution, be diminished during their continuance in office) and the retired pay of all commissioned and other personnel (except enlisted) of the Army, Navy, Marine Corps, Coast Guard, Coast and Geodetic Survey, Lighthouse Service, and the Public Health Service shall be reduced as follows: If more than $1,000 per annum but less than $10,000 per annum, 8⅓ per centum; if $10,000 per annum or more, but less than $12,000, 10 per centum; if $12,000 per annum or more, but less than $15,000 per annum, 12 per centum; if $15,000 per annum or more, but less than $20,000, 15 per centum; if $20,000 per annum or more, 20 per centum. This section shall not operate so as to reduce any rate of retired pay to less than $1,000 per annum."

"SPECIAL SALARY REDUCTIONS"

Sec. 107. (a) During the fiscal year ending June 30, 1933—

"(5) the salaries and retired pay of all judges (except judges whose compensation may not, under the Constitution, be diminished during their continuance in office), if such salaries or retired pay are at a rate exceeding $10,000 per annum, shall be at the rate of $10,000 per annum."

In July, 1932, the Comptroller General of the United States held that the Court of Appeals and the Supreme Court of the District of Columbia are " legislative " courts and not " constitutional " courts whose judges are entitled to the protection of Art. III, § 1, of the Constitution, which provides:

" The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges both of the Supreme and inferior Courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office."

Thereupon, the disbursing officer of the Department of Justice, pursuant to the ruling of the Comptroller General, reduced the annual compensation by 10 per cent. in the case of Justice O'Donoghue, and by 20 per cent. in the case of Justice Hitz, and over their protest paid to them for the months of July to December, 1932, inclusive, their compensation at this reduced rate.

On January 19, 1933, suits were brought in the Court of Claims to recover the amount of the deductions which had been made and enforced up to that time.

These suits are based upon the contention that the ruling of the Comptroller General, and the deductions made in pursuance thereof, are in violation of the provisions of the appropriation act just quoted, because § 107 specifically excepts from their operation " judges whose compensation may not, under the Constitution, be diminished during their continuance in office," and these plaintiffs are such judges. It is averred in the petitions that the ruling of the Comptroller General and the resulting deductions contravene Art. III, § 1, of the Constitution, since plaintiffs were appointed to serve during good behavior and to receive a compensation which constitutionally cannot be diminished during their continuance in office. It is further averred that the Supreme Court and Court of Appeals of the District are vested by acts of Congress with all the jurisdiction and all the power conferred on the United States by the Constitution under Art. III; that such jurisdiction and power have been exercised by the Court of Appeals from its organization

in 1893, and, by the Supreme Court of the District and its predecessor courts from the establishment of the government; that, therefore, in the organization of these courts Congress acted in virtue of Art. III, and thereby constituted said courts inferior courts of the United States; that only to the extent that Congress has enlarged and extended the powers of said courts did that body act under any other than Art. III; and that they are none the less such inferior courts because, by reason of their location at the seat of government, Congress, under Art. I, § 8.* has conferred upon them powers and jurisdiction which it may not confer upon other federal courts. Each plaintiff avers a reluctance to institute a suit which may result in personal benefit to himself, but that he feels it a duty to the court, to the bar, to the citizens of the District of Columbia, and to the people of the United States to have the status of these important courts defined and settled as soon as possible.

The Government demurred to the petitions, upon the ground, among others, that the justices of the District Supreme Court and Court of Appeals are not " judges of inferior courts " within the meaning of § 1 of Art. III of the Constitution, and are, therefore, not " judges whose compensation may not, under the Constitution, be diminished during their continuance in office," within the meaning of § 107 of the appropriation act hereinbefore quoted.

Upon this state of the record the Court of Claims certified the following questions upon which it desires instruc-

---

* Art. I, § 8, cl. 17: " The Congress shall have power . . . To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

tions, under § 3 (a) of the Act of February 13, 1925, c. 229, 43 Stat. 936, 939:

" I. Does Section 1, Article III, of the Constitution of the United States apply to the Supreme Court [and to the Court of Appeals] of the District of Columbia and forbid a reduction of the compensation of the Justices thereof during their continuance in office? "

" II. Can the compensation of a Justice of the Supreme Court [or of the Court of Appeals] of the District of Columbia be lawfully diminished during his continuance in office? "

Before entering upon a consideration of the subject, it is well to observe that Congress has not undertaken by the legislation under review to assume or indicate any view of the meaning of the constitutional provision involved, but has left open the question whether these judges or others are judges " whose compensation may not, under the Constitution, be diminished during their continuance in office." This relieves us from the duty, always a delicate one, of passing upon the constitutionality of the congressional act, and only requires us to ascertain and determine the meaning and application of the constitutional provision, to which determination, by the plain intent of Congress, the act will immediately accommodate itself. That is to say, neither the terms nor intent of the statute, but only the application made of it by the Comptroller General, will be affected by the construction which we shall put upon the constitutional limitation.

The questions propounded by the court below, find no answer in any conclusive adjudication of this court; and it will materially assist us in arriving at a correct determination if we shall first consider the great underlying purpose which the framers of the Constitution had in mind and which led them to incorporate in that instrument the provision in respect of the permanent tenure of office

and the undiminishable character of the compensation of the judges.

The Constitution in distributing the powers of government, creates three distinct and separate departments— the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital, *Springer* v. *Philippine Islands*, 277 U.S. 189, 201, namely, to preclude a commingling of these essentially different powers of government in the same hands. And this object is none the less apparent and controlling because there is to be found in the Constitution an occasional specific provision conferring upon a given department certain functions, which, by their nature, would otherwise fall within the general scope of the powers of another. Such exceptions serve rather to emphasize the generally inviolate character of the plan.

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not coöperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings " should be free from the remotest influence, direct or indirect, of either of the other two powers." Andrews, The Works of James Wilson (1896), Vol. 1, p. 367. And the importance of such independence was similarly recognized by Mr. Justice Story when he said that in reference to each other, neither of the departments

"ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers." 1 Story on the Constitution, 4th ed., § 530. To the same effect, The Federalist (Madison) No. 48. And see *Massachusetts* v. *Mellon,* 262 U.S. 447, 488.

The anxiety of the framers of the Constitution to preserve the independence especially of the judicial department is manifested by the provision now under review, forbidding the diminution of the compensation of the judges of courts exercising the judicial power of the United States. This requirement was foreshadowed, and its vital character attested, by the Declaration of Independence, which, among the injuries and usurpations recited against the King of Great Britain, declared that he had "made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries."

In framing the Constitution, therefore, the power to diminish the compensation of the federal judges was explicitly denied, in order, *inter alia,* that their judgment or action might never be swayed in the slightest degree by the temptation to cultivate the favor or avoid the displeasure of that department which, as master of the purse, would otherwise hold the power to reduce their means of support. The high importance of the provision, as the contemporary history shows, was definitely pointed out by the leading statesmen of the time. Thus, in The Federalist, No. 78, Hamilton said—"The complete independence of the courts of justice is peculiarly essential in a limited Constitution." And, in No. 79—"Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. . . . In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.*" (The italics are in the original.)

Chief Justice Marshall, in the course of the debates of the Virginia State Convention of 1829–1830 (pp. 616, 619), used the following strong and frequently quoted language:

"The Judicial Department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he [the judge] should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? . . . I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent Judiciary."

In a very early period of our history, it was said, in words as true today as they were then, that "if they [the people] value and wish to preserve their Constitution, they ought never to surrender the independence of their judges." Rawle on the Constitution, 2d ed., 281.

We need not pursue this phase of the subject further. It is fully discussed in *Evans* v. *Gore*, 253 U.S. 245, where this court (pp. 248–249) said:

"With what purpose does the Constitution provide that the compensation of the judges 'shall not be diminished during their continuance in office'? Is it primarily to benefit the judges, or rather to promote the public weal by giving them that independence which makes for an impartial and courageous discharge of the judicial function? Does the provision merely forbid direct diminution, such as expressly reducing the compensation from a greater to a less sum per year, and thereby leave the way open for indirect, yet effective, diminution, such as withholding or calling back a part as a tax on the whole? Or, does it mean that the judge shall have a sure and continuing right to the compensation, whereon he confidently may rely for his support during his continuance in office,

so that he need have no apprehension lest his situation in this regard may be changed to his disadvantage? "

And, after referring to statements from which we have quoted and others, the court added (p. 253):

" These considerations make it very plain, as we think, that the primary purpose of 'the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and competent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in accord with its spirit and the principle on which it proceeds.

" Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle."

In the light of the foregoing views,—time honored and never discredited—it is not extravagant to say that there rests upon every federal judge affected nothing less than a duty to withstand any attempt, directly or indirectly in contravention of the Constitution, to diminish this compensation, not for his private advantage—which, if that were all, he might willingly forego—but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guaranty of an independent judicial administration for the benefit of the whole people. It was this

motive that impelled Chief Justice Taney to protest against the attempt of the Treasury Department to exact a tax upon the compensation of the judges under an act of Congress passed in 1862, c. 119, § 86, 12 Stat. 472. 157 U.S., App. 701; *Evans* v. *Gore, supra,* pp. 257–259. The judges of the Court of Appeals of Virginia, as far back as 1788, in discharge of the same duty, directed to the members of the state assembly a "respectful remonstrance" against an act which had the effect of reducing their compensation. 4 Call (Va.) 135, 141. In the course of that remonstrance these judges said (pp. 143, 145):

"The propriety and necessity of the independence of the judges is evident in reason and the nature of their office; since they are to decide between government and the people, as well as between contending citizens; and, if they be dependent on either, corrupt influence may be apprehended, sacrificing the innocent to popular prejudice; and subjecting the poor to oppression and persecution by the rich. And this applies more forcibly, to exclude a dependence on the legislature; a branch, of whom, in cases of impeachment, is itself a party. . . . For vain would be the precautions of the founders of our government to secure liberty, if the legislature, though restrained from changing the tenure of judicial offices, are at liberty to compel a resignation by reducing salaries to a copper, . . ."

Actuated by like considerations of public duty, as it is averred, these plaintiffs brought the present suits.

The judges of the Supreme Court and of the Court of Appeals of the District of Columbia are of equal rank and power with those of other inferior courts of the federal system, and plainly within the spirit and reason of the compensation provision; and also within its intent, unless there be something in the Constitution, or in the character or organization of the District, or its relations to the

general government, or in the character of the courts themselves which precludes that conclusion. Indeed, the reasons which have been set forth, and which impelled the adoption of the constitutional limitation, apply with even greater force to the courts of the District than to the inferior courts of the United States located elsewhere, because the judges of the former courts are in closer contact with, and more immediately open to the influences of, the legislative department, and exercise a more extensive jurisdiction in cases affecting the operations of the general government and its various departments.

This court has repeatedly held that the territorial courts are "legislative" courts, created in virtue of the national sovereignty or under Art. IV, § 3, cl. 2, of the Constitution, vesting in Congress the power "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States"; and that they are not invested with any part of the judicial power defined in the third article of the Constitution. And this rule, as it affects the territories, is no longer open to question. Do the courts of the District of Columbia occupy a like situation in virtue of the plenary power of Congress, under Art. I, § 8, cl. 17, "To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States and the acceptance of Congress, become the seat of the government of the United States . . ."? This inquiry requires a consideration, first, of the reasons upon which rest the decisions in respect of the territorial courts.

The authority upon which all the later cases rest is *American Insurance Co.* v. *Canter,* 1 Pet. 511, 546, where the opinion was delivered by Chief Justice Marshall. The pertinent question there was whether the judicial power of the United States described in Art. III of the Constitution vested in the superior courts of the Territory of

Florida; and it was answered in the negative. "The Judges of the Superior Courts of Florida," the court said, "hold their offices for four years. These Courts, then, are not constitutional Courts, in which the judicial power conferred by the Constitution on the general government, can be deposited. They are incapable of receiving it. They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States. The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States."

This view was accepted and followed in *Benner* v. *Porter,* 9 How. 235, 242–244; *Clinton* v. *Englebrecht,* 13 Wall. 434, 447; *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655; *Good* v. *Martin,* 95 U.S. 90, 98; *Reynolds* v. *United States,* 98 U.S. 145, 154; *The City of Panama,* 101 U.S. 453, 460; *McAllister* v. *United States,* 141 U.S. 174, 180 *et seq.;* *United States* v. *McMillan,* 165 U.S. 504, 510; and *Romeu* v. *Todd,* 206 U.S. 358, 368.

A sufficient foundation for these decisions in respect of the territorial courts is to be found in the transitory character of the territorial governments. In the *McAllister* case, *supra,* this court, after stating that the Constitution had secured the independence of the judges of courts in which might be vested the judicial power of the United States by an express provision that they should hold office during good behavior and their compensation should not be diminished during their continuance therein, concluded (pp. 187–188)—"The absence from the Constitution of such guaranties for territorial judges was no doubt due to the fact that the organization of govern-

ments for the Territories was but temporary, and would be superseded when the Territories became States of the Union." And in the concurring opinion of Mr. Justice White in *Downes* v. *Bidwell*, 182 U.S. 244, 293, these decisions are said to grow out of the " presumably ephemeral nature of a territorial government."

In this connection, the peculiar language of the territorial clause, Art. IV, § 3, cl. 2, of the Constitution, should be noted. By that clause Congress is given power " to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Literally, the word " territory," as there used, signifies property, since the language is not " territory *or* property," but " territory or *other* property." There thus arises an evident difference between the words " *the* territory " and " *a* territory " of the United States. The former merely designates a particular part or parts of the earth's surface—the imperially extensive real estate holdings of the nation; the latter is a governmental subdivision which happened to be called a " territory," but which quite as well could have been called a " colony " or a " province." " The Territories," it was said in *National Bank* v. *County of Yankton*, 101 U.S. 129, 133, " are but political subdivisions of the outlying dominion of the United States." Since the Constitution provides for the admission by Congress of new states (Art. IV, § 3, cl. 1), it properly may be said that the outlying continental public domain, of which the United States was the proprietor, was, from the beginning, destined for admission as a state or states into the Union; and that as a preliminary step toward that foreordained end—to tide over the period of ineligibility—Congress, from time to time, created territorial governments, the existence of which was necessarily limited to the period of pupilage. In that view it is not unreasonable to conclude that the makers of the Constitution could never have intended to give

permanent tenure of office or irreducible compensation to a judge who was to serve during this limited and sometimes very brief period under a purely provisional government which, in all cases probably and in some cases certainly, would cease to exist during his incumbency of the office.

The impermanent character of these governments has often been noted. Thus, it has been said, " The territorial state is one of pupilage at best," *Nelson* v. *United States,* 30 Fed. 112, 115; "A territory, under the constitution and laws of the United States, is an inchoate state," *Ex parte Morgan,* 20 Fed. 298, 305; " During the term of their pupilage as Territories, they are mere dependencies of the United States." *Snow* v. *United States,* 18 Wall. 317, 320. And in *Pollard's Lessee* v. *Hagan,* 3 How. 212, 224, the court characterizes them as " the temporary territorial governments."

How different are the status and characteristics of the District of Columbia! The pertinent clause of the Constitution (Art. I, § 8, cl. 17) confers the power on Congress to " exercise exclusive legislation . . . over such district . . . as may . . . become the seat of the government of the United States." These are words of permanent governmental power. The District, as the seat of the national government, is as lasting as the States from which it was carved or the union whose permanent capital it became. It could not have been intended otherwise; and it was thus recognized by the act of acceptance in 1790 (§ 1, c. 28, 1 Stat. 130): " . . . the [District] is hereby accepted for the permanent seat of the government of the United States."

In the District clause, unlike the Territorial clause, there is no mere linking of the legislative processes to the disposal and regulation of the public domain—the landed estates of the sovereign—within which transitory governments to tide over the periods of pupilage may be con-

stituted, but an unqualified grant of permanent legislative power over a selected area set apart for the enduring purposes of the general government, to which the administration of purely local affairs is obviously subordinate and incidental. The District is not an " ephemeral " subdivision of the " outlying dominion of the United States," but the capital—the very heart—of the Union itself, to be maintained as the " permanent " abiding place of all its supreme departments, and within which the immense powers of the general government were destined to be exercised for the great and expanding population of forty-eight states, and for a future immeasurable beyond the prophetic vision of those who designed and created it.

Over this District Congress possesses "the combined powers of a general and of a State government in all cases where legislation is possible." *Stoutenburgh* v. *Hennick,* 129 U.S. 141, 147. The power conferred by Art. I, § 8, cl. 17, is plenary; but it does not exclude, in respect of the District, the exercise by Congress of other appropriate powers conferred upon that body by the Constitution, or authorize a denial to the inhabitants of any constitutional guaranty not plainly inapplicable. Circuit Judge Taft, afterwards Chief Justice of this court, speaking for himself, Judge Lurton, afterwards an associate justice of this court, and Judge Hammond, in *Grether* v. *Wright,* 75 Fed. 742, 756–757, after reciting the foregoing clause and the organization of the District under it, said:

" It was meet that so powerful a sovereignty should have a local habitation the character of which it might absolutely control, and the government of which it should not share with the states in whose territory it exercised but a limited sovereignty, supreme, it is true, in cases where it could be exercised at all, but much restricted in the field of its operation. The object of the grant of exclusive legislation over the district was, therefore, national in the highest sense, and the city organized under the

grant became the city, not of a state, not of a district, but of a nation. In the same article which granted the powers of exclusive legislation over 'its seat of government are conferred all the other great powers which, make the nation, including the power to borrow money on the credit of the United States. He would be a strict constructionist, indeed, who should deny to congress the exercise of this latter power in furtherance of that of organizing and maintaining a proper local government at the seat of government. Each is for a national purpose, and the one may be used in aid of the other."

*Cailan* v. *Wilson*, 127 U.S. 540, 550:

" There is nothing in the history of the Constitution or of the original amendments to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guarantees of life, liberty, and property—especially of the privilege of trial by jury, in criminal cases."

It is important to bear constantly in mind that the District was made up of portions of two of the original states of the Union, and was not taken out, of the Union by the cession. Prior thereto its inhabitants were entitled to all the rights, guaranties, and immunities of the Constitution, among which was the right to have their cases arising under the Constitution heard and determined by federal courts created under, and vested with the judicial power conferred by, Art. III. We think it is not reasonable to assume that the cession stripped them of these rights, and that it was intended that at the very seat of the national government the people should be less fortified by the guaranty of an independent judiciary than in other parts of the Union.

In *Downes* v. *Bidwell*, *supra*, [162 U.S. 244,] in the opinion delivered by Mr. Justice Brown, at pp. 260–261, it is said:

" This District had been a part of the States of Maryland and Virginia. It had been subject to the Constitution, and was a part of the United States. The Constitution had attached to it irrevocably. There are steps which can never be taken backward. The tie that bound the States of Maryland and Virginia to the Constitution could not be dissolved, without at least the consent of the Federal and state governments to a formal separation. The mere cession of the District of Columbia to the Federal government relinquished the authority of the States, but it did not take it out of the United States or from under the aegis of the Constitution. Neither party had ever consented to that construction of the cession. If, before the District was set off, Congress had passed an unconstitutional act, affecting its inhabitants, it would have been void. If done after the District was created, it would have been equally void; in other words, Congress could not do indirectly by carving out the District what it could not do directly. The District still remained a part of the United States, protected by the Constitution. Indeed, it would have been a fanciful construction to hold that territor, which had been once a part of the United States ceased to be such by being ceded directly to the Federal government."

That the Constitution is in effect in the territories as well as in the District has been so often determined in the affirmative that it is no longer an open question. Whether that instrument became operative in virtue of its own force, or because of its formal extension by acts of Congress, is a consideration which does not affect the present inquiry. It is enough that the Constitution is in force, and the question here, as well as in the case of the territories, is simply whether the provisions of Art. III relied upon are applicable. Because, for the peculiar reasons already stated, they are inapplicable to the terri-

tories, it does not follow that they are likewise inapplicable to the District where these peculiar reasons do not obtain. In the concurring opinion of Mr. Justice White in the *Downes* case, certain principles applicable to the situation with which we are dealing are enumerated. Among them (pp. 289, 292) are these: " Every function of the government being thus derived from the Constitution, it follows that that instrument is everywhere and at all times potential in so far as its provisions are applicable. . . . In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises, is not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is applicable." And then follows, almost immediately, at page 293, the observation already quoted, that the decisions in respect of the inapplicability of the third Article of the Constitution to the territorial courts grow out of the " presumably ephemeral nature of a territorial government."

In the opinion delivered by Mr. Justice Brown, following the quotation which we have already made, it is said (p. 266):

"As the only judicial power vested in Congress is to create courts whose judges shall hold their offices during good behavior, it necessarily follows that, if Congress authorizes the creation of courts and the appointment of judges for a limited time, it must act independently of the Constitution, and upon territory which is not part of the United States within the meaning of the Constitution. . . . It is sufficient to say that this case [*American Insurance Co.* v. *Canter, supra*] has ever since been accepted as authority for the proposition that the judicial clause of the Constitution has no application to courts created in the territories, and that with respect to them Congress has a power wholly unrestricted by it."

After an exhaustive review of the prior decisions of this court relating to the matter, the following propositions, among others, were stated as being established:

" 1. That the District of Columbia and the territories are not States, within the judicial clause of the Constitution giving jurisdiction in cases between citizens of different States;

" 2. That territories are not States, within the meaning of Revised Statutes, sec. 709, permitting writs of error from this court in cases where the validity of a *state* statute is drawn in question;

" 3. That the District of Columbia and the territories are States, as that word is used in treaties with foreign powers, with respect to the ownership, disposition and inheritance of property;

" 4. That the territories are not within the clause of the Constitution providing for the creation of a Supreme Court and such inferior courts as Congress may see fit to establish."

The significant point to be observed in this enumeration is that the opinion is careful to distinguish between those propositions which relate both to the territories and the District of Columbia, and those which relate to the territories alone; so that when the court in paragraph 4 excepts from the operation of Art. III of the Constitution only the territories, it is equivalent to a determination either that the District was not subject to the same rule, or that the question in respect of the District had not then been decided.

No less significant in this respect is the decision in *Cross* v. *United States*, 145 U.S. 571, 576. In that case it was held that a writ of error would not lie to review a judgment of the Supreme Court of the District, sitting in appellate review of the conviction of a person of a capital crime. The government contended that the writ would

not lie because the Supreme Court of the District was not a court of the United States within the intent and meaning of the act of Congress of February 6, 1889, c. 113, 25 Stat. 655, which provided that in capital cases tried before " any court of the United States " the final judgment could be reviewed by this court upon a writ of error. *McAllister* v. *United States, supra*, was cited in support of that contention, but this court said, ". . . it is to be remembered that that case referred to territorial courts only." And the contention of the government in this respect was rejected, the writ being dismissed on a different ground.

In *American Insurance Co.* v. *Canter, supra,* the Chief Justice gave as a conclusive reason why the territorial courts were not constitutional courts vested with the judicial power designated in Art. III of the Constitution that—" They are incapable of receiving it." It is not hard to justify this observation in respect of courts created for a purely provisional government to serve merely between events; but the District Supreme Court and Court of Appeals are permanent establishments—federal courts of the United States and part of the federal judicial system. *Federal Trade Comm'n* v. *Klesner,* 274 U.S. 145, 154, 156:

" The parallelism between the Supreme Court of the District and the Court of Appeals of the District, on the one hand, and the district courts of the United States and the circuit courts of appeals, on the other, in the consideration and disposition of cases involving what among the States would be regarded as within federal jurisdiction, is complete."

To the same effect, see *Claiborne-Annapolis Ferry* v. *United States,* 285 U.S. 382, 390–391.

In the light of all that has now been said, we are unable to perceive upon what basis of reason it can be said that these courts of the District are *incapable* of receiving the

judicial power under Art. III. In respect of them we take the true rule to be that they are courts of the United States, vested generally with the same jurisdiction as that possessed by the inferior federal courts located elsewhere in respect of the cases enumerated in § 2 of Art. III. The provision of this section of the article is that the " judicial power shall extend " to the cases enumerated, and it logically follows that where jurisdiction over these cases is conferred upon the courts of the District, the judicial power, since they are capable of receiving it, is, *ipso facto,* vested in such courts as inferior courts of the United States.

The fact that Congress, under another and plenary grant of power, has conferred upon these courts jurisdiction over non-federal causes of action, or over quasi-judicial or administrative matters, does not affect the question. In dealing with the District, Congress possesses the powers which belong to it in respect of territory within a state, and also the powers of a state. *Keller* v. *Potomac Elec. Co.,* 261 U.S. 428, 442–443. " In other words," this court there said, " it possesses a dual authority over the District and may clothe the courts of the District not only with the jurisdiction and powers of federal courts in the several States but with such authority as a State may confer on her courts. *Kendall* v. *United States,* 12 Pet. 524, 619. Instances in which congressional enactments have been sustained which conferred powers and placed duties on the courts of the District of an exceptional and advisory character are found in *Butterworth* v. *Hoe,* 112 U.S. 50, 60; *United States* v. *Duell,* 172 U.S. 576, and *Baldwin Co.* v. *Howard Co.,* 256 U.S. 35. Subject to the guaranties of personal liberty in the amendments and in the original Constitution, Congress has as much power to vest courts of the District with a variety of jurisdiction and powers as a state legislature has in conferring jurisdiction on its courts. In *Prentis* v. *Atlantic Coast Line Co., supra,* we

held that when ' a state constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder so far as the Constitution of the United States is concerned.' (211 U.S. 225.) *Dreyer* v. *Illinois,* 187 U.S. 71, 83, 84."

If, in creating and defining the jurisdiction of the courts of the District, Congress were limited to Art. III, as it is in dealing with the other federal courts, the administrative and other jurisdiction spoken of could not be conferred upon the former. But the clause giving plenary power of legislation over the District enables Congress to confer such jurisdiction in addition to the federal jurisdiction which the District courts exercise under Art. III, notwithstanding that they are recipients of the judicial power of the United States under, and are constituted in virtue of, that article.

Since Congress, then, has the same power under Art. III of the Constitution to ordain and establish inferior federal courts in the District of Columbia as in the states, whether it has done so in any particular instance depends upon the same inquiry—Does the judicial power conferred extend to the cases enumerated in that article? If it does, the judicial power thus conferred is not and cannot be affected by the additional congressional legislation, enacted under Article I, § 8, cl. 17, imposing upon such courts other duties, which, because that special power is limited to the District, Congress cannot impose upon inferior federal courts elsewhere. The two powers are not incompatible; and we perceive no reason for holding that the plenary power given by the District clause of the Constitution may be used to destroy the operative effect of the judicial clause within the District, where, unlike the territories occupying a different status, that clause is entirely appropriate and applicable.

The matter has been well stated by Mr. Justice Groner, speaking for the District Court of Appeals, in *Pitts* v.

*Peak,* 60 App.D.C. 195, 197, 50 F. (2d) 485, 487, a case which we had occasion very recently to cite (*Claiborne-Annapolis Ferry* v. *United States, supra,* at p. 391):

"But it by no means follows that because Congress has seen fit, by virtue of its authority over the District of Columbia, to confer upon the courts of the District administrative functions, which outside the District it may not confer upon courts created solely under article 3, these courts are any the less created under that article of the Constitution, nor do we know of anything in the history of these courts or in the legislation with relation to them which would indicate the contrary. We think a reasonable and correct view of the subject would indicate that, in the creation and organization of the superior courts of the District of Columbia, Congress has availed of its dual constitutional right in the first place to establish courts of law and invest them, as it has, with power and jurisdiction over all cases and controversies [with] which, under the authority of article 3, it has invested the district courts of the United States, and, in the second place, in the exercise of the power of a sovereign state, under the provisions of section 8 of article 1, has further imposed upon them jurisdiction and power which it cannot impose upon other like courts functioning outside the District. There is no inhibition in the Constitution against the exercise by Congress of this dual power, arising as it does out of an express grant in the one case (article 3) and an implied grant in the other (article 1, § 8), nor does its exercise in the one case exhaust its power and prevent its exercise in the other, and therefore we assume, when Congress created the two courts—the District Courts of the United States and the Supreme Court of the District of Columbia—and gave to each, within its own sphere, identical jurisdiction, that it drew its power from the same source, even though it was necessary it should have recourse to another provision of the Constitution in order

to clothe the courts at the seat of government with other and additional authority not permissible under article 3."

And see also *James* v. *United States,* 38 Ct. Cls. 615, 627–631, which this court on appeal disposed of on another ground, saying it was unnecessary to decide the constitutional question. 202 U.S. 401.

The conclusion to which we have come is in accord with the continuous and unbroken practice of Congress from the beginning of the government. In 1801 (c. 15, § 3, 2 Stat. 103, 105) Congress established the Circuit Court of the District of Columbia, the judges thereof to hold office during good behavior, giving the court and the judges the same powers as were vested in the circuit courts of the United States and the judges thereof. In 1863, that court was superseded by, and its jurisdiction conferred upon, the present District Supreme Court (c. 91, 12 Stat. 762), the judges to hold their offices during good behavior. Many acts of Congress refer to these courts as " courts of the United States." In the District Code, passed March 3, 1901 (c. 854, 31 Stat. 1189), it is provided, § 61, that the Supreme Court of the District " shall be deemed a court of the United States." And § 84 provides that it " shall have and exercise the same powers and jurisdiction as the *other* district courts of the United States." In *Swift & Co.* v. *United States,* 276 U.S. 311, 324, it was contended that the District Supreme Court lacked jurisdiction of a case arising under the Sherman Anti-Trust Act, because it was not a district court of the United States within the meaning of that act; but this court held that the contention had been adversely disposed of by *Federal Trade Comm'n* v. *Klesner, supra;* and in a footnote at page 325 attention was called to the fact that suits to enjoin patent infringements under R.S. § 4921 are entertained by the Supreme Court of the District solely by virtue of its general powers as " a District Court of the United States."

The District Court of Appeals was established in 1893 (c. 74, 27 Stat. 434), the judges to hold office during good behavior. Congress invariably has fixed the same salaries for the judges of the Supreme Court of the District as for the judges of the district courts of the United States sitting elsewhere, and the salaries of the judges of the District Court of Appeals the same as for the judges of the United States circuit courts of appeals. When one has been increased, the other has been increased in like amount. Indeed, the congressional practice from the beginning recognizes a complete parallelism between the courts of the District and the district and circuit courts of appeals of the United States. See *Federal Trade Comm'n* v. *Klesner, supra,* generally, and especially the language already quoted.

The protest of Chief Justice Taney apparently did not bear fruit until 1869, at which time Attorney General Hoar delivered an opinion in response to a request of the Secretary of the Treasury, holding that if the act of 1862 imposed a tax upon the salaries of the President and the justices of the Supreme and inferior courts of the United States, it was unconstitutional. 13 Op. Atty. Gen. 161. Upon this authority the taxes which had been paid were refunded, and in 1872 a like refund of taxes was made to the judges of the Supreme Court of the District of Columbia, as shown by the records and files of the Treasury Department.

It is true, of course, that Congress, in conferring the life tenure upon the judges of the courts of the District, and in doing the other things mentioned above, might have done so merely as a matter of legislative discretion, without deeming it to be a matter of constitutional compulsion. Nevertheless, a practice so uniform and continuous indicates, with some degree of persuasive force, that Congress entertained the view that the courts of the District and the inferior courts of the United States sitting

elsewhere, stood upon the same constitutional footing. In any event, it is not without significance that in the acts of Congress from the beginning of the government to the present day, nothing has been brought to our attention that is inconsistent with that view.

The government relies almost entirely upon the decision of this court in *Ex parte Bakelite Corp.*, 279 U.S. 438. In that case we held that the Court of Customs Appeals was a legislative court, not a constitutional court under Art. III of the Constitution. In the course of the opinion attention was called to the decisions in respect of the territorial courts, and it was said that a like view had been taken in respect of the status and jurisdiction of the courts provided by Congress for the District of Columbia. This observation, made incidentally, by way of illustration merely and without discussion or elaboration, was not necessary to the decision, and is not in harmony with the views expressed in the present opinion. "It is a maxim, not to be disregarded," said Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264, 399, "that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Two cases are cited in support of the *dictum* in the *Bakelite* opinion—*Keller* v. *Potomac Elec. Co.*, *supra*, and *Postum Cereal Co.* v. *Calif. Fig Nut Co.*, 272 U.S. 693, 700. The *Keller* case we have already discussed. It simply holds that in virtue of its dual power over the

District, Congress may vest non-judicial functions in the courts of the District. We find nothing in that decision which cannot be reconciled with what we have here said. In the case of *Postum Cereal Co.*, the court follows the *Keller* case in holding that administrative or legislative functions may be vested in the courts of the District, but adds that this may not be done with any federal court established under Art. III of the Constitution. Taken literally, this seems to negative the view that the superior courts of the District are established under Art. III. But the observation, read in the light of what was said in the *Keller* case in respect of the dual power of Congress in dealing with the courts of the District, should be confined to federal courts in the states as to which no such dual power exists; and thus confined, it is not in conflict with the view that Congress derives from the District clause distinct powers in respect of the constitutional courts of the District which Congress does not possess in respect of such courts outside the District.

We hold that the Supreme Court and the Court of Appeals of the District of Columbia are constitutional courts of the United States, ordained and established under Art. III of the Constitution; that the judges of these courts hold their offices during good behavior, and that their compensation cannot, under the Constitution, be diminished during their continuance in office.

In accordance with that view the questions propounded are answered.

> *Question No. 1, Yes.*
> *Question No. 2, No.*

The CHIEF JUSTICE, MR. JUSTICE VAN DEVANTER, and MR. JUSTICE CARDOZO, dissenting.

We are of the opinion that the courts of the District of Columbia, as this court has repeatedly declared, are

not courts established under § 1 of Article III of the Constitution, but are established under the broad authority conferred upon the Congress for the government of the District of Columbia by paragraph 17 of § 8 of Article I. Hence, the limitations imposed by § 1 of Article III, with respect to tenure and compensation, are not applicable to judges of these courts. The special authority conferred for the government of the District of Columbia necessarily includes the power to establish courts deemed to be appropriate for the District (*Kendall* v. *United States*, 12 Pet. 524, 619), including the power to fix and alter tenure and compensation. It is a power complete in itself and derives nothing from § 1 of Article III. It is a power not less complete, but essentially the same as that which is conferred upon the Congress for the government of territories. *American Insurance Co.* v. *Canter*, 1 Pet. 511, 546; *McAllister* v. *United States*, 141 U.S. 174. It is not a dual power in the sense that it is derived from two sources, that is, both from Article III and also from the constitutional provision for the government of the District, but is dual only in the sense that the latter provision confers an authority so broad that it enables the Congress to invest the courts of the District not only with jurisdiction and powers analogous to those of federal courts within the States but also with jurisdiction and powers analogous to those which States may vest in their own courts. As the courts of the District do not rest for their creation on § 1 of Article III, their creation is not subject to any of the limitations of that provision. Nor would those limitations, if considered to be applicable, be susceptible of division so that some might be deemed obligatory and others might be ignored. If the limitations relating to courts established under § 1 of Article III applied to the courts of the District of Columbia, they would necessarily prevent the attaching to the latter courts of jurisdiction and powers of an adminis-

trative sort. It is only because the Congress, in establishing the courts of the District of Columbia, is free from the limitations imposed by § 1 of Article III that administrative powers can be, and are, conferred upon them. *Keller* v. *Potomac Electric Co.*, 261 U.S. 428, 442, 443; *Postum Cereal Co.* v. *California Fig Nut Co.*, 272 U.S. 693, 700; *Ex parte Bakelite Corp.*, 279 U.S. 438, 450.

With the question of policy, this court is not concerned, save as policy is determined by the Constitution. The question is one of constitutional interpretation which has hitherto been deemed to be settled.