Spencer **WILLIAMS**, Aubrey E. Robinson, Jr., C. Clyde Atkins, Louis C. Bechtle, Sandra S. Beckwith, Lucius D. Bunton, III, William M. Byrne, Jr., Adrian G. Duplantier, Irving Hill, Morris E. Lasker, Thomas C. Platt, Jr., John W. Reynolds, Walter H. Rice, Marvin H. Shoob, Joseph L. Tauro, Laughlin E. Waters, Lee R. West, Charles Wiggins and Henry R. Wilhoit, Jr., Plaintiffs–Appellees,

v.

**UNITED STATES, Defendant– Appellant.**

Nos. 99–1572, 00–1254, 00–1255.

United States Court of Appeals, Federal Circuit.

Feb. 16, 2001.

Rehearing and Suggestion for Rehearing en Banc Denied April 30, 2001.

ORDER

MAYER, Chief Judge, with whom NEWMAN and RADER, Circuit Judges, join, dissenting from the order declining rehearing en banc.

Because I believe this case is wrongly decided and the court has declined to take it en banc, I respectfully dissent.

Article III, section 1 of the Constitution provides that "[t]he Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." The Compensation Clause is intended to promote judicial independence from the legislative and executive branches of government and external influences, and to ensure that the federal courts are able to attract quality people to the bench. *See United States v. Will*, 449 U.S. 200, 220–21, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *O'Donoghue v. United States*, 289 U.S. 516, 530–33, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); *Evans v. Gore*, 253 U.S. 245, 253–54, 40 S.Ct. 550, 64 L.Ed. 887 (1920). It would be unhealthy, if not unseemly, were judicial service acceptable by only those of means on the one hand, and those of marginal competence on the other. The prohibition of diminution is not intended for the benefit of the judges, but to enhance the quality of justice for everyone. *See Evans*, 253 U.S. at 253, 40 S.Ct. 550. In giving effect to these purposes, the Supreme Court has broadly interpreted the Compensation Clause to protect against the remotest influence, direct or indirect, by the other branches of government. *See id.* at 253–54, 40 S.Ct. 550. Independence translates to integrity.

The Rule of Necessity compels the courts to adjudicate judicial pay cases. It would alleviate the attendant squeamishness if one kept his eye on the constitutional principle instead of the admittedly paltry sums at issue when he engages in what is really just garden variety statutory interpretation. This is not an occasion for fastidiousness. If the judicial department will not tend the fences between it and the legislative and executive, no one else is going to do it.

The Ethics Reform Act of 1989, Pub.L. No. 101–194, 103 Stat. 1716, is more than the mere "method of calculating salaries" at issue in *Will*, 449 U.S. at 227, 101 S.Ct. 471. It is a comprehensive codification of ethical rules (§§ 301–303), financial reporting requirements (§ 202), work rules for senior judges (§ 705), prohibitions on outside income and honoraria (§ 601), a twenty-five percent pay raise (§ 703), and future cost of living adjustments (COLAs) (§ 704). It was passed as and was intended to be a package, the parts unseverable one from the other. *Cf. United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 478, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); 135 Cong. Rec. H29,484 (statement of Rep. Martin stating that the Ethics Reform Act of 1989 is a comprehensive and interrelated package).

The judicial COLA provisions of the Ethics Reform Act are linked to adjustments to General Schedule (GS) salaries. In any year in which GS salaries are adjusted under 5 U.S.C. § 5303(a), federal judges' salaries automatically increase by a statutorily defined formula based on the Employment Cost Index (ECI) published by the Bureau of Labor Statistics. *See* Ethics Reform Act § 704(a)(1). No additional action is required by Congress or the President to implement the salary adjustments.

The court relies on *Will* for the proposition that Congress may eliminate judicial COLAs so long as they act before the COLAs are "payable and due." 449 U.S.

at 228–29, 101 S.Ct. 471. But that is the question here, not the answer. The Ethics Reform Act invoked the provisions of 28 U.S.C. § 461(a)(1) to establish the timing of judicial COLAs. Pay increases in the form of COLAs are "effective at the beginning of the first applicable pay period commencing on or after the first day of the month in which an adjustment takes effect under section 5303 of title 5 in the rates of pay under the General Schedule." The court interprets the effective date of the pay increase as determinative of when the COLAs are "payable and due." Therefore, it peremptorily but not persuasively says that under the rule of *Will*, Congress may block judicial COLAs any time before the effective date of the COLA.

But in *Will*, the Supreme Court was faced with a statutory scheme totally different from the Ethics Reform Act: the Executive Salary Cost–of–Living Adjustment Act of 1975 (Adjustment Act), Pub.L. No. 94–82, 89 Stat. 419. The Adjustment Act tied judicial salary increases to adjustments made to GS salaries under the Federal Pay Comparability Act of 1970, 5 U.S.C. §§ 5305–06. Under the Comparability Act, an independent recommendation on salary adjustments was made to the President. The President could either issue an order implementing the recommended adjustments to salaries and submit a report to Congress, or submit to Congress an alternative salary adjustment plan. Either House of Congress could object to the alternative plan, in which case the independent recommendation would take effect. *See Will*, 449 U.S. at 203–04, 101 S.Ct. 471 (describing the procedures of the Comparability Act).

Under the Adjustment Act, judicial COLAs were contingent upon subsequent actions of the President and Congress. The act did not change judicial pay; it merely modified the existing formula for deter-

mining what it would be. *See Will*, 449 U.S. at 227, 101 S.Ct. 471. Not so the Ethics Reform Act. As part and parcel of the restrictions on judges accepting outside income and honoraria and the other burdens, Congress raised judicial pay and attached an automatic COLA provision intended to maintain that pay level until it might consider another pay raise advisable. Each adjustment is just a ministerial application of the ECI. *Will* does not apply because the salary adjustments are not "payable and due" as of the effective date of each annual increase; they became payable and due on the effective date of the statute, January 1, 1991. Unlike the Adjustment Act, the Ethics Reform Act created essentially a structured payment plan with a twenty-five percent immediate pay increase coupled with automatic COLAs based on the ECI to maintain the value of the salaries during inflation. Fixing future salaries by adopting an indexing plan is the same for all intents and purposes as specifying actual dollars. *See Boehner v. Anderson*, 30 F.3d 156, 162 (D.C.Cir.1994) ("We see no reason whatsoever why the Congress cannot, for convenience, instead specify an index or formula with the same effect."). Blocking the automatic COLAs, after January 1, 1991, therefore, runs afoul of *Will* and Article III.

The immediate vesting of the judicial COLAs in 1991 is confirmed by the need for Congress to satisfy the then impending 27th Amendment to the Constitution, which provides: "No law, varying the compensation [of Members of Congress], shall take effect until an election of Representatives shall have intervened." Congress knew that ratification was imminent and that the amendment would prevent individual COLA provisions from taking effect during future congressional terms in which they became effective. By imbedding an automatic COLA mechanism, the Ethics Reform Act avoids the 27th Amendment's prohibition of current term pay adjust-

ments for Members of Congress. *See Boehner*, 30 F.3d at 161–62. The identical automatic judicial COLA provision took effect the same time as Congress' COLA provision, thereby becoming "due and payable" on January 1, 1991. It would be incongruous in the extreme if Congress vested COLA's for the purposes of the 27th Amendment but not Article III. The identical language used in the same law for each branch of government should be interpreted consistently, especially since Congress was legislating against the backdrop of *Will* and strove mightily to satisfy it.

*Boehner* did not reach another argument, that blocking of congressional COLAs was therefore a "varying" of pay in violation of the 27th amendment. That is to say, if the COLA was vested in 1991, any action to block it from kicking in during a subsequent session is a prohibited variance. But, of course, that is precisely what it is under Article III.

The differences between the Ethics Reform Act and the system discussed in *Will* are the essence of the legislative bargain that is an alternative basis for affirmance of the district court's judgment. As the district court aptly observed and this court discounts, these differences were:

(1) First, the district court noted that the 1989 [Ethics Reform] Act "imposes severe limitations on the outside income federal judges may earn, forbids the receipt of honorar[ia] and imposes mandatory work loads on senior judges." *Williams [v. United States]*, 48 F.Supp.2d [52,] 57 [ (D.D.C.1999) ].

(2) Second, the district court noted that the 1989 [Ethics Reform] Act "revised the process for providing annual cost-of-living adjustments for federal judges" by establishing a "trigger" when there is an adjustment to GS salaries, and that "Con-

gress took control and prescribed the means for determining the annual pay adjustment." *Id.*

(3) And third, the district court noted that the 1989 [Ethics Reform] Act set a five percent cap on the amount of any COLA for federal judges. *See id.*

Slip op. at 23. Contrary to this court's contention, however, the first distinction is important; it is the essence of the bargain struck by Congress, whereby it would provide regular cost-of-living adjustments to maintain the value of the concomitant twenty-five percent salary increase in exchange for the limitations on outside income and honoraria and the mandatory work loads on senior judges. I am willing to assume for the moment that Congress could have restricted outside income, generally from teaching, and honoraria without creating a mechanism for offsetting cost-of-living adjustments because it is irrelevant to the legislative bargain that was actually struck in the Ethics Reform Act. *But cf. Nat'l Treasury Employees Union*, 513 U.S. at 478, 115 S.Ct. 1003.

As the dissent correctly says, the Task Force report and recommendations spoke directly to the relationship between limitations on honoraria and outside earned income, and the need for adjustments in the salaries of senior government officials. The Task Force "consider[ed] the salary provisions of its recommendations to be an integral part of the total ethics package being proposed.... Along with adequate compensation there should be less need to supplement income from outside sources." *Report of the Bipartisan Task Force on Ethics on H.R. 3660, Government Ethics Reform Act of 1989*, 101st Cong. (1989), 135 Cong. Rec. H9265. Indeed, there were efforts in both houses of Congress to separate the salary provisions from the ethics reforms, all of which failed. If they were not inextricable, no one would have wasted the time in the effort. There is,

therefore, no ambiguity in Congress's purpose to provide the regular cost-of-living adjustments to maintain adequate pay in exchange for the prohibitions on outside earnings and the rest.

The court believes that the legislative bargain applies only to those federal judges that had previously sought compensation for extra activities. This misapprehends the nature of the bargain among members of Congress, which recognized the impropriety of imposing income-earning restrictions without providing a reliable mechanism to maintain an adequate salary in return. There was no effort to limit the benefits of that bargain to those who had actually sought additional sources of income or honoraria, and it is improper for the court to assign one. The bargain was intended to affect all federal judges and to remove the need for additional income then and in the future. But even if some judges still felt the need, they no longer had the opportunity. That is what was lost by all judges, not just those who had outside earnings before the effective date of the act. In light of the gross increase in outside money sluicing through governance in the last decade, I suspect far more judges would have had the opportunity, if not the inclination, to partake were it not for the still extant prohibition. Simply put, in blocking the judicial COLAs for 1995, 1996, 1997 and 1999, Congress "withhold[s] or take[s] from a judge a part of that which has been promised by law for his services." *Evans*, 253 U.S. at 254, 40 S.Ct. 550. I would vacate this court's opinion and affirm the judgment of the United States District Court for the District of Columbia.

NEWMAN, Circuit Judge, with whom MAYER, Chief Judge, and RADER, Circuit Judge, join, dissenting from the order declining hearing en banc.

It is the right, privilege, and duty of the courts to assure that the constitutional safeguards are preserved. No safeguard is more fundamental than the separation of governmental power, the checks and balances, among the three branches. This case is not about the cost of living. It is about the balance of governmental power.

The action of the Congress in recent years, to withhold from the judges the monetary adjustment that is provided to all others serving the federal government, is as petty as it is unconstitutional. The Framers were concerned that Congress, if unchecked, would dominate the coordinate branches through the power of the purse. *See The Federalist No. 48*, 308, 310 (James Madison)(Clinton Rossiter ed., 1961) (the most difficult task was to provide "practical security for each against the invasion of others" and particularly of the legislature, who as sole possessor of the fiscal power "can, with the greater facility, mask, under complicated and indirect measures, the encroachments which it makes on the coordinate departments.") Madison cautioned that as "the legislative department alone has access to the pockets of the people" it has "a prevailing influence, over the pecuniary rewards of those who fill the other departments." *Id.* at 310.

The Framers recognized that an independent judiciary is the bulwark of justice—

> independent not in the sense that they shall not co-operate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments.

*O'Donoghue v. United States*, 289 U.S. 516, 530, 53 S.Ct. 740, 77 L.Ed. 1356 (1933). It is our judicial duty to act, with vigor and determination, to sustain this fundamental structure, to set aside any action of the legislative that departs from

the constitutional design. In securing the Constitution, "no restriction upon its plain and obvious import ought to be admitted, unless the inference is irresistible." *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 338–39, 4 L.Ed. 97 (1816). The Court has well recognized the significance of control of judicial compensation in the federal structure:

> [T]here rests upon every federal judge affected nothing less than a duty to withstand any attempt, directly or indirectly in contravention of the Constitution, to diminish this compensation, not for his own private advantage—which, if that were all, he might willingly forego—but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guaranty of an independent judicial administration for the benefit of the whole people.

*O'Donoghue,* 289 U.S. at 533, 53 S.Ct. 740.

This concern for judicial independence is now, once more, presented for judicial resolution. Today's politics-driven tweaking of the judiciary is, at bottom, an assault on the balance between the judicial and the political branches of government. The implicit ratification, by a panel of this court, of Congress' actions—both the tying of judges' compensation to that of Congress and the withdrawal from judges of the statutory adjustment provided to all federal employees—is a misreading of precedent as well as of the Constitution.

The separation of powers is not only the balance and check upon the powers of the other branches; it is also the fulcrum of the institution of judicial review of legislative and executive action. The cavalier actions here at issue belie their significance to the nation; they confirm the prescience of the Framers in imparting constitutional force to insulation of the judiciary from politically motivated pay reduction:

> In framing the Constitution, therefore, the power to diminish the compensation of federal judges was explicitly denied, in order, inter alia, that their judgment or action might never be swayed in the slightest degree by the temptation to cultivate the favor or avoid the displeasure of that department which, as master of the purse, would otherwise hold the power to reduce their means of support.

*O'Donoghue,* 289 U.S. at 531, 53 S.Ct. 740.

The nineteen judges who have come forward as plaintiffs, the split decision of the panel, the carefully reasoned district court decision, and the national concern for proper exercise of governmental power, warrant the attention of our full court. From the refusal of the court to consider this matter *en banc* I must, respectfully, dissent.