UNITED STATES of America, Appellee,

v.

Gary STEWART, Appellant.

No. 95–3163.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1996.

Decided Jan. 21, 1997.

As Amended Feb. 10, 1997.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs.

John Crabb, Jr., Assistant U.S. Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., U.S. Attorney, John R. Fisher, Thomas J. Tourish, Jr. and Edward G. Burley, Assistant U.S. Attorneys, were on the brief.

Before: GINSBURG, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Appellant Gary Stewart[1] makes five challenges to his convictions by a jury of conspiracy to distribute, and distribution of, 50 grams or more of cocaine base, and failure to appear while on release pursuant to the Bail Reform Act. He contends, first, that there was insufficient evidence to show his involvement in more than a single sale of drugs and that he was prejudiced by the variance between the evidence of his involvement in a one-day conspiracy and the evidence con-

---

1. Appellant's true name is Jorge de la Espada.

cerning a larger conspiracy. Second, he contends that the district court erred in admitting the drugs he sold into evidence because the government failed to meet its burden of proof on the chain of custody, and that the district court abused its discretion by curtailing cross examination of a government expert on the chain of custody, denying appellant his right to present a defense. Third, he contends that his Bail Reform Act conviction must be reversed because the committing judge acted without authority and, alternatively, there was insufficient evidence to show that he willfully failed to appear. His last two contentions are that the district court's failure to strike testimony by an undercover officer who stated that he recognized appellant from a "prior investigation" was prejudicial, and that he is entitled to be resentenced because the district court failed to recognize that it had discretion to depart downward in view of appellant's status as an alien.

We hold that there was sufficient evidence to link appellant to the larger conspiracy, and that therefore any variance of proof was not prejudicial. We also hold that because a twelve day delay between the placement of the drugs in a police vault and their retrieval at a testing laboratory does not in itself constitute a break in the chain of custody, the district court did not err in allowing the drugs into evidence. In the absence of a proffer of what counsel expected to establish from the testimony of the government's expert on police procedures concerning the handling of the drugs in the instant case, we find no abuse of discretion by the district court in curtailing further cross examination on this subject. We hold, further, that an Article I judge of the Superior Court of the District of Columbia has authority under the Bail Reform Act to set conditions of release for a defendant facing federal criminal charges, that appellant was released under the Act, and that there was sufficient evidence for the jury to have found that his violation of the terms of his release was willful. Finally, we conclude that appellant's contentions of prejudice as a result of testimony about a "prior investigation" and the district court's purported failure to recognize its discretion to depart downward because of

appellant's alien status are meritless. Accordingly, we affirm the judgment of conviction.

## I.

Viewed most favorably to the government, *United States v. Graham*, 83 F.3d 1466, 1470 (D.C.Cir.1996), the evidence showed that on six occasions Maurice Stewart, Richard Shorter, and Damon Edwards, ("the co-conspirators") sold crack cocaine in small amounts to undercover police officers of the Metropolitan Police Department ("MPD"). Most of the six transactions took place in a parking area behind 1803 4th Street, N.W. During those transactions as well as in the course of arranging a seventh and final sale, the co-conspirators mentioned a "big man," stating that they needed to talk to him about proposed sales of larger amounts of drugs.

The seventh sale occurred when, after arranging the terms of a purchase of 250 grams of crack in exchange for $7,000 and several firearms, Maurice Stewart and Shorter brought the undercover officers to a building at 1620 15th Street, N.W. They agreed that the officers would turn over $5,000 and the guns to the co-conspirators, and Maurice Stewart and Shorter would keep the guns and pay an additional $2,000 to their supplier. When they arrived, Shorter approached appellant, who was seated on the porch of the building. Appellant told Shorter that he wanted to count the money, but the undercover officer refused because he had not brought the agreed upon amount. When the officer began to walk away, pretending to end the deal, Shorter lied to appellant, telling him that the money had already been counted. Appellant then went inside and reemerged with a grocery bag containing an oatmeal canister filled with 219.67 grams of cocaine base.

Maurice Stewart and Shorter returned with the officers to 1803 4th Street, N.W. As Maurice Stewart was about to take possession of the guns, an arrest team moved in. The two undercover officers accompanied by other officers then returned to 1620 15th Street, where they arrested appellant. No

money was found on appellant at the time of arrest.

Appellant and his co-conspirators were charged with two counts of conspiracy—to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 846, and to possess an unregistered firearm during a narcotics trafficking offense in violation of 18 U.S.C. § 371—and one count of unlawful distribution of 50 grams or more of cocaine base on May 10, 1991, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii). Only appellant went to trial, on a superseding indictment, adding a charge of failure to appear under the Bail Reform Act, 18 U.S.C. § 3146, and dropping the gun conspiracy charge; his co-conspirators entered guilty pleas. The jury found appellant guilty on all counts. The district court, after denying appellant's motion for judgment as a matter of law or, alternatively, for a new trial, also denied his request for a downward departure in his sentence based on his status as an alien.[2]

## II.

■ Appellant challenges his convictions for conspiracy on the ground that no reasonable jury could have found that he was involved in more than a single buyer-seller transaction. Attempting to distinguish other cases on their facts, appellant maintains that absent direct, as opposed to circumstantial, evidence of his involvement in prior transactions of the charged conspiracy, the government failed to meet its burden of proof. He further contends that he was prejudiced by the variance between the direct proof of his involvement in a one day conspiracy and the evidence at trial of a larger conspiracy involving his co-conspirators.

■ The government may meet its burden of proof by circumstantial as well as direct evidence, *United States v. Treadwell,* 760 F.2d 327, 333 (D.C.Cir.1985), and we conclude that it has done so, even if, as the district court observed, the evidence was "thin." Evidence of an ongoing criminal relationship between a defendant and his co-

conspirators, combined with a conspiracy that is limited in scope and takes place over a limited period of time, as with involvement by a defendant in the final or largest sale following a small number of related transactions, may provide a jury with a reasonable basis to find that the final transaction was more than a mere buyer-seller exchange, and that the defendant was aware that the conspiracy entailed more than just one discrete sale. *United States v. Miranda–Ortiz,* 926 F.2d 172, 175–76 (2d Cir.), *cert. denied,* 502 U.S. 928, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991). *See also United States v. Murray,* 618 F.2d 892, 903 (2d Cir.1980); *United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir.1971) (per curiam).

Although the evidence showed that appellant was not personally present when the first six sales of small amounts of crack occurred, the co-conspirators repeatedly referred to the need to get instruction about larger sales from someone else in their criminal enterprise. The prosecutor did state in closing argument to the jury that the person consulted was "unlikely" to be appellant, given the testimony of a government expert that a supplier would probably not personally be present when so large an amount of drugs was being sold. But nothing required the jury to accept the expert's testimony or the prosecutor's opinion. Even if the jury adopted the prosecutor's view of the evidence and did not believe that appellant had orchestrated a series of transactions, the jury could still reasonably find that appellant was linked to the greater conspiracy.

First, the evidence showed that appellant agreed to supply crack to the co-conspirators and that he assisted them in its distribution. Unlike *United States v. Morris,* 836 F.2d 1371 (D.C.Cir.1988), in which the defendant sold only small quantities of drugs, here appellant sold over 200 grams of crack cocaine for $9,000. The jury thus reasonably could find that he was aware that the drugs he was

2. The district court sentenced appellant to concurrent terms of 188 months imprisonment on the drug counts, a consecutive sentence of one month on the Bail Reform Act count, and to

concurrent terms of five years' supervised release for the drug convictions and two years for the Bail Reform Act conviction.

selling would be distributed.[3]

Second, the evidence suggested that there was a prior relationship between appellant and his co-conspirators. The evidence showed that appellant engaged in ongoing communication with the co-conspirators for purposes of arranging the seventh, and largest, drug sale, and that he had reason to trust them. Two of the co-conspirators drove the undercover officers to appellant's location, and appellant completed the sale based on the representation of one of the co-conspirators that he had counted the money brought by the officers and could vouch that it was the agreed upon amount.

■ Third, the final transaction in which appellant was directly involved takes on added significance insofar as, according to expert testimony introduced by the government, the earlier sales were instrumental in forging a relationship between buyer and seller in order to build up to a more substantial deal. *See United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir.1974). That appellant may not have joined the conspiracy prior to the seventh and final sale is irrelevant with respect to his potential criminal liability as a conspirator for the prior drug sales. *United States v. Jackson,* 627 F.2d 1198, 1212 (D.C.Cir. 1980); *United States v. Bridgeman,* 523 F.2d 1099, 1107–08 (D.C.Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 1744, 48 L.Ed.2d 206 (1976). In *United States v. Theodoropoulos,* 866 F.2d 587 (3d Cir.1989), a defendant who was found to have been a supplier was held responsible for conspiring to commit a series of drug transactions, despite a lack of evidence that he was aware of the terms and details of each individual sale. *Id.* at 594. *See also United States v. Jenkins,* 928 F.2d 1175, 1178–79 (D.C.Cir.1991); *United States v. Lam Kwong–Wah,* 924 F.2d 298, 302–03 (D.C.Cir.1991); *United States v. Wood,* 879 F.2d 927, 938 (D.C.Cir.1989); *United States v. Tarantino,* 846 F.2d 1384, 1393 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988).

■ Appellant's related contention that he was prejudiced by the variance between the one-day conspiracy, of which the government could offer direct evidence of his involvement, and the evidence presented by the government of a larger conspiracy is also unpersuasive. Whatever variance there may have been between the indictment and the proof at trial was not unduly prejudicial as the government stressed that appellant did not personally participate in the first six drug sales or in the weapons exchange. *United States v. Gatling,* 96 F.3d 1511, 1519 (D.C.Cir.1996); *United States v. Graham,* 83 F.3d 1466, 1471–72 (D.C.Cir.1996); *United States v. Bertolotti,* 529 F.2d 149, 154–57 (2d Cir.1975).

■ Where the evidence is sufficient to support a jury finding that a defendant was liable as a member of a conspiracy, there is generally no prejudice due to the variance between those transactions substantiated through direct proof and those supported by circumstantial evidence. *Graham,* 83 F.3d at 1472; *Childress,* 58 F.3d at 709–15; *Bridgeman,* 523 F.2d at 1119. Instead, the cases in which prejudicial variance has been found have involved indictments against multiple defendants for participation in large and complex conspiracies where the evidence at trial showed, at best, several discrete conspiracies that were substantially smaller in scope. *See, e.g. United States v. Johansen,* 56 F.3d 347, 350–52 (2d Cir.1995). As appellant was tried alone, his is not a case in which the number of defendants and conspiracies tried together created a danger that, due to "spillover" effects, appellant might be found guilty based on evidence properly admitted only against someone else. *United States v. Anderson,* 39 F.3d 331, 347–48 (D.C.Cir. 1994). Hence, appellant can draw no support from *United States v. Coward,* 630 F.2d 229, 230–31 (4th Cir.1980), in which there were clear indications that the joint trial of two defendants had created confusion in the minds of the jurors. *See also Gatling,* 96

---

**3.** Appellant also contends that *United States v. Childress,* 58 F.3d 693, 714 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996), is distinguishable in view of the far larger quantity of drugs at issue in that case.

Appellant does not dispute, however, that the jury could have inferred that, as the supplier of over 200 grams of cocaine, he would have been aware that the drugs were intended for distribution.

F.3d at 1519. Consequently, appellant cannot demonstrate that he was "unduly prejudiced" by the variance as would warrant reversal of his conviction. *United States v. Pearson*, 667 F.2d 12, 15 (5th Cir.1982).

## III.

■ Appellant also contends that his drug related convictions must be reversed because the government failed to meet its burden of proof to show that the chain of custody of the drug evidence against him remained intact. Specifically, he points to an unexplained twelve-day delay between the time the MPD officer placed the drugs, which were enclosed in a heat-sealed envelope inside a box, into the MPD Narcotics Division vault, and the time that the chemist from the Drug Enforcement Agency ("DEA") retrieved the drugs from the vault. He further contends that the district court denied him the right to present a defense by curtailing defense counsel's cross examination of the government's expert on the chain of custody. We are unpersuaded that these contentions entitle appellant to any relief.

The evidence showed that the undercover officers took the drugs that appellant had sold to Detective Todd Williams at the MPD Narcotics Branch. Williams had the paper bag containing the drugs dusted for fingerprints and then turned over the bag and drugs to Investigator Wayne Stancil to seal the drugs and complete the necessary paperwork. Stancil placed the drugs in a heat-sealed envelope, sealed it, and then, on May 10, 1991, put it and the other contents of appellant's grocery bag into a box that Stancil placed in the MPD Narcotics Branch vault. Although an MPD officer testified that such evidence is ordinarily delivered from the Narcotics vault to the DEA laboratory for analysis within one business day, a DEA report showed that its laboratory did not receive the evidence against appellant until May 22, 1991, twelve days after Investigator Stancil had placed it in the vault. Consequently, appellant contends, there was sufficient evidence to dissolve the presumption that evidence held by government officials has been properly preserved. He then maintains that because the government failed to show by a reasonable probability that the possibility of misidentification and adulteration was eliminated, the district court erred in admitting the drugs into evidence.

■ In *United States v. Lane*, 591 F.2d 961, 962 (D.C.Cir.1979), the court held that the presumption in favor of the integrity of evidence routinely handled by government officials may be rebutted with a "minimal showing" of bad faith or evidence of tampering. However, the government's burden to show a proper chain of custody only requires it to demonstrate that, "as a matter of reasonable probability," possibilities of misidentification and adulteration have been eliminated. *United States v. Robinson*, 447 F.2d 1215, 1220 (D.C.Cir.1971) (in banc) (quoting *Gass v. United States*, 416 F.2d 767, 770 (D.C.Cir.1969)). The government persuasively maintains that it met its burden here because there is no suggestion that the drugs left the vault during the twelve-day period and DEA chemists who analyzed the drug sample found no evidence of tampering. An MPD officer further testified that, as a general matter, if any signs of tampering are found in items to be delivered to the DEA, or if items are found to be unsealed, the problem is investigated and the evidence is not accepted at the laboratory. Under the circumstances, because the evidence was at no point missing or accessible to unauthorized persons, the delay in transferring the drugs from the vault at the Narcotics Branch to the DEA did not constitute a break in the chain of custody. *See Lane*, 591 F.2d at 964. Rather, the evidence of the delay went to the weight to be ascribed to the drug evidence by the jury, not its admissibility. *See United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir.1993). Given the evidence of the precautions taken by the police and the DEA to identify and protect the drugs, the district court did not err in admitting them into evidence. *See Lane*, 591 F.2d at 965–66.

■ In a related contention, appellant maintains that he was denied his right to present a defense as a result of the district court's refusal to let defense counsel pursue further cross examination of Officer David Stroud, a government expert in drug trafficking, concerning what might have happened to

the drugs during the twelve-day period. At the beginning of his testimony, Stroud stated that he was not involved in any aspect of the investigation concerning the instant case and that he had no first-hand knowledge of the facts. After Stroud testified regarding the normal procedures by which the police turn over seized drug evidence to DEA, defense counsel explored some of the same ground on cross examination and Stroud testified that deliveries to the DEA usually are made the day after receipt at the Narcotics Branch. However, when defense counsel asked Stroud why drug evidence that was placed in the vault on May 10, 1991, would have been received by the DEA laboratory on May 22, the district court sustained an objection by the government, ruling that the defense should move on. When defense counsel persisted, the court repeated its ruling, stating that counsel could ask no further questions concerning the length of time it normally takes for drugs to get from the vault to the laboratory. The court also prohibited defense counsel from inquiring into documents that might reflect the delivery date of drugs from the vault, ruling that this had already been explored.

 The "right to present a defense" is "a fundamental element of due process of law," *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967), and the preclusion of all inquiry by the defense on a particular aspect of the case violates that right. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *United States v. Hodge,* 19 F.3d 51, 53 (D.C.Cir.1994); *United States v. Leonard,* 494 F.2d 955, 970–71 (D.C.Cir. 1974). The district court did not, however, preclude all defense inquiry about the chain of custody. Rather, the court exercised its discretion to rule out repetitive questioning and further questioning of the expert witness concerning particular events with which he was unfamiliar. The circumstances could not be more different from *United States v. Foster,* 982 F.2d 551, 554 (D.C.Cir.1993), on which appellant relies, in which the court concluded that the district court had abused its discretion in curtailing defense counsel's questions on a crucial point. As the court recently observed in *United States v. Morri-*

*son,* 98 F.3d 619, 627 (D.C.Cir.1996), the district court does not abuse its discretion in cutting off examination of a witness where the question would call for a speculative answer. *See United States v. Thorne,* 997 F.2d 1504, 1513 (D.C.Cir.), *cert. denied,* 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 467 (1993); *Foster,* 982 F.2d at 553.

Apart from suggesting that Officer Stroud might have speculated as to possible explanations for the twelve-day gap, appellant has not proffered what defense counsel hoped to learn from further questioning of the expert, who had no personal knowledge of relevant events surrounding the chain of custody. Further, to the extent that appellant suggests that defense counsel was precluded from inquiring about the chain of custody with another witness, a question put to a DEA chemist concerning DEA's procedures was going over ground previously covered. On cross examination defense counsel brought out through Officer Stroud that the drugs were not transported from the Narcotics Branch vault to the DEA laboratory in accordance with the normal schedule. Under the circumstances, appellant's claim that he was denied his right to present a defense is meritless.

 We also find no abuse of discretion by the court in limiting cross examination of the expert witness. *See Thorne,* 997 F.2d at 1513; *Harbor Ins. Co. v. Schnabel Found. Co.,* 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992). To the extent that defense counsel sought to focus on the transport of the particular drugs at issue, the expert was not the appropriate witness because he lacked any relevant personal knowledge; counsel's questions appropriately should have been posed to the officers in the actual chain of custody. In addition, the subject of the cross-examination was tangential: appellant's defense focused on his claim of misidentification. At no point did he maintain that the substance he sold to the undercover officers on May 10, 1991, was something other than crack cocaine or that the amount differed from that of the drugs introduced into evidence. That one under-

cover officer testified that he placed the drugs in the MPD vault on May 10, while another witness testified that they were retrieved at the DEA laboratory on May 22, merely presented an issue for the jury to consider in determining what weight to ascribe to the drug evidence.

Likewise, appellant's contention that the district court erred by restricting discussion during closing argument of a discrepancy in the testimony concerning whether a field test was conducted on the substance handed over by Stewart, does not demonstrate that the district court abused its discretion in its chain of custody rulings. A jury note asking where the drugs were located between May 10 and May 22 reflects at most that this question was not definitively answered by the evidence at trial, not, as appellant suggests, that the jury was confused or did not know how to evaluate the evidence that had been presented. The likelihood, moreover, that additional inquiry would have revealed that tampering took place appears remote. In view of the identification evidence credited by the jury, any error in limiting cross examination of the expert would be harmless beyond a reasonable doubt. *United States v. Shyllon,* 10 F.3d 1, 4 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1206, 114 S.Ct. 1327, 127 L.Ed.2d 675 (1994).

## IV.

Appellant challenges his conviction for violating the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.* (1988 & Supp.1996), on the grounds that the District of Columbia judge lacked authority to set release pursuant to the Act and, alternatively, that there was insufficient evidence that he knowingly failed

to appear as required by the terms of his release order. We first address *de novo, see United States v. Wishnefsky,* 7 F.3d 254, 256 (D.C.Cir.1993), his initial contention, premised on the proposition that the district court erred in ruling that under the Bail Reform Act Article I judges of the Superior Court of the District of Columbia are authorized to act as federal magistrates for purposes of releasing a defendant held for federal charges.

Appellant was presented in the Superior Court of the District of Columbia on Saturday, May 11, 1991, the day following his arrest. At that time, a Superior Court judge ordered him released on condition that he report to the United States District Court at 11:00 a.m. on May 13, 1991. Appellant reported to the Pretrial Services Agency office in the federal courthouse at 9:00 a.m. on May 13, but he was not present for his arraignment that afternoon at 1:30 p.m. before a United States Judicial Magistrate. A bench warrant issued that day but was not executed until August 30, 1994.

The Bail Reform Act imposes criminal penalties for persons who, "having been released under this chapter knowingly ... fail[ ] to appear before a court as required by the conditions of release." 18 U.S.C. § 3146(a)(1) (Supp.1996). To prove a violation of the statute, the government must show that appellant was released under the statute, that he was required to appear in court, that he knew he was required to appear, that he failed to appear, and that his failure was willful. *Weaver v. United States,* 37 F.3d 1411, 1412–13 (9th Cir.1994).[4] The statute provides for "release and detention authority generally" under § 3141,[5] and specifically for "release or detention of a defendant pending trial" under § 3142.[6] Both sec-

---

**4.** *See also United States v. Bodiford,* 753 F.2d 380, 381–82 (5th Cir.1985); *United States v. Burns,* 667 F.2d 781, 782–83 (9th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2304, 73 L.Ed.2d 1306 (1982).

**5.** Section 3141, "Release and detention authority generally," provides in relevant part:

> (a) **Pending trial.**—A judicial officer authorized to order the arrest of a person under section 3041 of this title before whom an arrested person is brought shall order that such

person be released or detained, pending judicial proceedings, under this chapter.
18 U.S.C. § 3141(a) (Supp.1996).

**6.** Section 3142, "Release or detention of a defendant pending trial," provides in relevant part:

> (a) **In General.**—Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be—

tions refer to the "judicial officer" authorized to order pretrial release, which § 3156(a)(1) defines, for purposes of § 3141 through § 3150, as including all persons authorized under § 3041 [7] and "any judge of the Superior Court of the District of Columbia." [8] *Id.*

Appellant contends that the broader category of "judicial officers" defined in § 3156(a)(1) does not apply to § 3141 because the reference in § 3141 to § 3041 means that only the officials listed in § 3041, and hence not D.C. Superior Court judges, are authorized to grant release under the Bail Reform Act. Relying on the clause in § 3156(a)(1) that states that its definition of "judicial officer" applies "unless otherwise indicated," appellant maintains that the reference in § 3141 to § 3041 makes clear that the broader definition in § 3156(a)(1) does not apply. He speculates that there could have been a geographic reason why Congress intended § 3041 to exclude D.C. officials because, while federal courthouses may be inaccessible from remote parts of large states, the District of Columbia is small enough that all persons accused of federal crimes can easily be brought before federal judges or

magistrates. Our response is two-fold: first, § 3142 and § 3156(a)(1) of the Bail Reform Act provide the authorization for appellant's release under the Bail Reform Act by a D.C. Superior Court judge; second, the historical context demonstrates that the term "judicial officer" in § 3041 included judges of the D.C. courts during the eighteenth and early nineteenth century, when those were courts of the United States, and subsequently, when Congress amended the release provisions in 1966, in recognition of the fact that it had created local courts for the District of Columbia under Article I, clause 17, section 8 of the Constitution, it included a definition in the Bail Reform Act expressly referring to "courts" as well as "persons," and named D.C. judges of an Article I court as "judicial officers."

Appellant's release by the Superior Court judge pending trial clearly falls under § 3142, and § 3156(a)(1) provides that such a judge is authorized to act under § 3142. Appellant was charged with a violation of federal law, he was presented for pretrial release, and he was specifically instructed to report to the federal district courthouse. The judge

---

(1) released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;

. . . . .

(h) **Contents of Release Order.**—In a release order issued under subsections (b) [release on personal recognizance] or (c) [release on conditions] of this section, the judicial officer shall—

(1) include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and

(2) advise the person of—

(A) the penalties for violating a condition of release, including the penalties for committing an offense while on pretrial release;

(B) the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and

(C) sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investigations), 1512 (tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim or an informant).

18 U.S.C. § 3142(a), (h) (Supp.1996).

7. Section 3041, "Power of courts and magistrates," provides in relevant part:

For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, *of any state* where the offender may be found ... be arrested and imprisoned or released as provided in chapter 207 of this title ... for trial before such court of the United States as by law has cognizance of the offense.

18 U.S.C. § 3041 (Supp.1996) (emphasis added).

8. Section 3156, "Definitions," provides in relevant part:

(a) As used in sections 3141–3150 of this chapter—

(1) the term "judicial officer" means, *unless otherwise indicated,* any person or court authorized pursuant to section 3041 of this title, or the Federal Rules of Criminal Procedure, to detain or release a person before trial or sentencing or pending appeal in a court of the United States, and any judge of the Superior Court of the District of Columbia;

18 U.S.C. § 3156(a)(1) (Supp.1996) (emphasis added).

thus exercised powers expressly set forth in § 3142. As this court made clear in *United States v. Thompson*, 452 F.2d 1333, 1338–39 (D.C.Cir.1971), *cert. denied*, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972), serious constitutional issues could arise were the Bail Reform Act not to apply to persons in the District of Columbia who are charged with federal offenses.

Furthermore, Congress vested the judges of the D.C. Court of General Sessions with authority to grant bail under the Bail Reform Act, whether the defendant was charged with offenses cognizable in that court or in the federal district court,[9] and upon enactment of the District of Columbia Court Reform and Criminal Procedure Act of 1970,[10] Congress vested judges of the D.C. Superior Court with the powers previously exercised by judges of the D.C. Court of General Sessions.[11] Although, effective February 1, 1971, D.C. Superior Court judges also had authority to order release of D.C. offenders pursuant to a law applying only to District of Columbia,[12] there is nothing to indicate that the powers formerly exercised by the judges of the General Sessions court to act as federal committing magistrates for purposes of bail were repealed.

It is true, in one sense, that if §§ 3141 and 3142 are viewed as overlapping sources of authority enabling judicial officers to order pretrial release, § 3141(a) would be rendered redundant, contrary to the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988). On the other hand, such maxims, while often providing useful assistance in interpretation, do not always offer conclusive resolution of statutory ambiguities, particularly when other sources are available to indicate how a statute was intended to be applied. *See, e.g., United States v. Crane*, 979 F.2d 687, 690 (9th Cir.1992). In another sense, the two sections serve different purposes. While § 3141 refers to release and detention authority "generally," § 3142 focuses specifically on release and detention of defendants "pending trial." Under the canon of statutory construction dictating that specific statutory provisions modify general ones, even if D.C. Superior Court judges were left out of § 3141, their inclusion in § 3142 with specific reference to pre-trial release indicates that they are authorized to grant release under the Act. *See United Ass'n of Journeymen and Apprentices of the Plumbing & Pipe Fitting Indus. v. Reno*, 73 F.3d 1134, 1140 (D.C.Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). The Supreme Court has instructed that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one," *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974), reflecting the proposition that when Congress has focused on a particular subject, a court can reasonably rely on that expression of congressional intent, by contrast with a generally worded statute where it is unclear whether Congress focused on the particular matter at issue. *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932).

9. D.C.Code § 11–923(c) (1967) provided:
 In all cases, whether cognizable in the Court of General Sessions or in the District Court, the Court of General Sessions has jurisdiction to make preliminary examination and commit offenders or grant bail in bailable cases, either for trial or for further examination.

10. Pub.L. No. 91–358, 84 Stat. 475 (codified at D.C.Code §§ 11–101 *et seq.* (1973)) ("D.C. Court Reform Act").

11. *See* D.C.Code § 11–901 (1973).

12. As part of the D.C. Court Reform Act, Congress enacted a Bail Reform Act for the District of Columbia, replacing the Bail Reform Act of 1966, which Congress had made applicable to the D.C. courts in the D.C. Bail Agency Act, Pub.L. No. 89–519, § 4(a), 80 Stat. 327 (codified at D.C.Code §§ 903(a) *et seq.* (1967)). *See* D.C.Code §§ 11–923(c)(2), 23–1332 *et seq.* (1973). *See also* Bruce D. Beaudin, *Bail in the District—What It Was; Is; and Will Be,* 20 Am. U. Law. Rev. 432, 440 (1970–71); Carl S. Rauh & Earl J. Silbert, *Criminal Laws and Procedure: the D.C. Court Reform and Criminal Procedure Act of 1970, id.* at 287 (observing that the D.C. Bail Act retained the basic format of the Bail Reform Act of 1966 but included "a number of significant additions and changes").

■ Even acknowledging, as appellant suggests, that there is an ambiguity arising from the omission of a direct reference to D.C. Superior Court judges in § 3041 and the direct reference to those judges in § 3156(a)(1), which applies to § 3141 and § 3142, the court is simply obligated, under those circumstances, to determine congressional intent in enacting the Bail Reform Act, examining the statutory language in the context of the statutory scheme as a whole, and with regard to its object and purposes. *See McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). While the plain language of the statute is an important guide, "manifest intent prevails over the letter." *In re Nofziger,* 925 F.2d 428, 434 (D.C.Cir.1991). Where competing interpretations of a statute are available, courts will not attribute to Congress the intent to bring about an anomalous result. *United States v. Bergh,* 352 U.S. 40, 45, 77 S.Ct. 106, 109, 1 L.Ed.2d 102 (1956).

From a historical perspective, there is every reason to conclude that D.C. judges have long been authorized to act as federal committing magistrates. First, the language of § 3041 originated in the Judiciary Act of 1789,[13] which defined the powers of United States courts and United States magistrates and others to arrest, imprison, or release on bail suspected violators of federal law. Such powers were granted to "any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where [the suspect] may be

found...."[14] At this time and into the nineteenth century, Congress left enforcement of selected criminal laws to state courts and to Article IV territorial courts and, in military matters, to certain Article I courts. *See Palmore v. United States,* 411 U.S. 389, 402–04, 93 S.Ct. 1670, 1678–80, 36 L.Ed.2d 342 (1973). When the District of Columbia was established,[15] its courts were vested with dual Article III and Article I powers, both having "equal rank and power with those of other inferior courts of the federal system" and having other powers similar to those of state courts. *O'Donoghue v. United States,* 289 U.S. 516, 534, 53 S.Ct. 740, 744, 77 L.Ed. 1356 (1933).[16] *See generally id.* at 547–48, 53 S.Ct. at 749. Thus, its Circuit Court,[17] and thereafter the Supreme Court of the District of Columbia[18] were referred to as "courts of the United States," and the District Supreme Court and Court of Appeals[19] were considered to be "federal courts of the United States and part of the federal judicial system." *Id.* at 544, 53 S.Ct. at 748. *Cf. District of Columbia v. Carter,* 409 U.S. 418, 420–21, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973).

Second, for purposes of the instant case, the next significant change occurred when Congress enacted the Bail Reform Act of 1966.[20] That Act was designed "to revise existing bail procedures in the courts of the United States, including the courts of the District of Columbia...."[21] The Act included a "[d]efinitions" provision, codified as § 3152(1), defining the term "judicial officer" to mean "any person *or court* authorized pursuant to section 3041 of this title, or the

---

**13.** Act of Sept. 24, 1789, ch. 20, § 33, 1 Stat. 73, 91 (1789).

**14.** *Id.*

**15.** Act of July 16, 1790, ch. 28, § 1, 1 Stat. 130 (1790).

**16.** In *O'Donoghue,* the Supreme Court held that the District Supreme Court and Court of Appeals were "constitutional courts of the United States, ordained and established under [Article III] of the Constitution," whose "judges ... hold their offices during good behavior [and whose] compensation cannot ... be diminished during their continuance in office." *Id.* at 551, 53 S.Ct. at 750.

**17.** *See* Act of Feb. 27, 1801, ch. 15, § 3, 2 Stat. 103, 105 (1801).

**18.** *See* Act of March 3, 1863, ch. 91, 12 Stat. 762, 762–63 (1863).

**19.** *See* Act of Feb. 9, 1893, ch. 74, 27 Stat. 434 (1893).

**20.** Pub.L. 89–465, 80 Stat. 214 (1966). *See also* 18 U.S.C. § 3041 (1966). *See generally United States v. Leathers,* 412 F.2d 169, 171 (D.C.Cir. 1969).

**21.** H. Rep. No. 1541, *reprinted in* 1966 U.S.C.C.A.N. 2294 ("1966 House Report").

Federal Rules of Criminal Procedure ... or any judge of the District of Columbia Court of General Sessions." [22] Although § 3152 functioned as does the current § 3156, and does not expressly address whether D.C. judges were intended to fall within the meaning of "judicial officer" as defined by § 3041, the Report of the House Committee on the Judiciary on the Senate bill referred to the House explained that Congress added the phrase "or court" to § 3152 because "the [1966 Act] includes a judge of the District of Columbia court of general sessions in the definition of 'judicial officer' ... because those judges sit as committing magistrates for felonies to be tried in the U.S. District Court for the District of Columbia." [23]

In other words, the Bail Act of 1966 reflected Congress' reorganization of the District of Columbia's previously established courts. Because the D.C. Court of General Sessions was an Article I court with limited criminal jurisdiction not including felonies,[24] the reference to "judicial officer" in § 3041 needed clarification, and hence Congress provided express authorization of "[a] court" in § 3152, which was defined to mean a judge of the D.C. Court of General Sessions.[25] Had Congress assumed that no preexisting authority existed under § 3041 and that, pursuant to § 3152, D.C. judges would be empowered as committing magistrates of federal

defendants for the first time, it logically would have referred disjunctively to "persons" authorized under § 3041 and the Federal Rules · of Criminal Procedure and to "judges" of the D.C. Court of General Sessions. By referring more generally in the statute to D.C. "courts" as authorized to order release under § 3041, the 1966 House Report indicates that the provision was not intended to exclude D.C. judges from serving as federal committing magistrates.

Third, nothing in the definitions contained in § 3156 of the Bail Reform Act, enacted in 1975 as part of the Speedy Trial Act,[26] indicates that Congress intended to preclude judges of the D.C. courts from acting as federal committing magistrates. Section 3156 retained almost verbatim the language in § 3152, except for changing the reference to the D.C. Court of General Sessions to the newly established Superior Court of District of Columbia,[27] and extending the definitions section to §§ 3146–3150 of the Bail Reform Act.[28] Section 3156(a)(1) retained the phrase "person or court," in reference to those authorized to order release under § 3041, but it, too, did not amend § 3041 to add D.C. Superior Court judges to the list of officials authorized to act as federal committing magistrates.

**22.** 18 U.S.C. § 3152(1) (1966) (emphasis added).

**23.** 1966 House Report, at 2, *reprinted in* 1966 U.S.C.C.A.N. at 2294. The House Report noted with apparent approval the concurrence of its subcommittee in the recommendation of the Justice Department supporting the applicability of the Bail Reform Act to all cases prosecuted in the D.C. courts by the U.S. attorney's office. *Id.* at 14, 1966 U.S.C.C.A.N. at 2303–04. The companion Senate bill included a provision making all crimes in violation of an Act of Congress tried in the D.C. Court of General Sessions within the purview of the bail reform legislation. "Memorandum Re Comparison of S. 1357, as reported by the Senate Judiciary Committee, and H.R. 10195," *reprinted in* 1966 U.S.C.C.A.N. at 2307–09.

**24.** Pub.L. 88–241, 77 Stat. 478 (1963) (establishing the D.C. Court of General Sessions). *See* D.C.Code § 961 (1967) (Court of General Sessions has exclusive civil jurisdiction over matters under $10,000), § 963 (1967) (Court of General Sessions has original criminal jurisdiction, concurrently with the U.S. District Court for the

District of Columbia, of misdemeanors .punishable by fine or imprisonment of one year or less and of offenses against municipal ordinances and regulations).

**25.** For the sake of historical completeness, we note that the D.C. Court of General Sessions assumed the jurisdiction of the Municipal Court for the District of Columbia, which, in turn, had assumed in 1942 the jurisdiction of two prior courts, the Police Court and the first Municipal Court. *See* D.C.Code § 11–961 (Revision Notes).

**26.** Pub.L. 93–619, tit. II, § 201, 88 Stat.2076, 2088 (1975), *reprinted in* 1974 U.S.C.C.A.N. at 2407.

**27.** *See* D.C. Court Reform Act, *supra* n. 10, tit. I, § 111, 84 Stat. 482.

**28.** The Bail Reform Act of 1984 substituted new §§ 3141–50 release provisions for the prior §§ 3146–3151. S. REP. No. 98–225 at 3, 5, *reprinted* 1984 U.S.C.C.A.N. 3182, 3186 (1984) ("1984 Senate Report").

However, the House Report on the House bill, which was subsequently adopted by both Houses, supports the conclusion that Congress did not intend to exclude D.C. Superior Court judges from the "judicial officers" authorized to order release for federal defendants.[29] Congress' reasons for exempting the local court system from provisions of the Speedy Trial Act were otherwise focused, noting the major transitions underway in those courts and in the local government itself as a result of congressional delegations of authority,[30] and do not support the notion that in the 1975 amendments to the pretrial release provisions of the Bail Reform Act Congress could have intended to remove the authority of D.C. judges to act as federal committing magistrates. Further, given the extensive discussion in the legislative history underlying Congress' decision to exempt the District of Columbia courts from the Speedy Trial Act, it is implausible that Congress simultaneously intended to exclude D.C. judges from the pretrial release provisions but failed to explicitly acknowledge its decision. The exemption is consistent with the continuing need for a specific reference in § 3156(a)(1) to D.C. Superior Court judges, since the D.C. Superior Court, although a court of general trial jurisdiction, was an Article I court, not vested with Article III powers as were the early District of Columbia courts.[31]

Fourth, although the Bail Reform Act of 1984[32] included substantial revisions to address, among other issues, the need to consider community safety in setting conditions for pretrial release, and repealed former §§ 3141–51, the definition of "judicial officer" in § 3156(a)(1) continued to include D.C. Superior Court judges.[33] The 1984 Act included what is now codified as § 3142 and made some amendments to § 3041, § 3141 and § 3156, but nothing in the 1984 Act or its legislative history suggests that Congress previously intended to bar D.C. judges from ordering pretrial release of federal offenders under § 3041.[34]

▮▮▮ Viewed in light of this background, appellant's interpretation of the relationship of § 3041 with other provisions of the Bail Reform Act is meritless, resting on a reading of § 3156(a)(1) in isolation from its historical context. In emphasizing the reference to D.C. judges in § 3156(a)(1) and the absence thereof in § 3041, appellant would have the court adhere rigidly to the maxim "expressio unius est exclusio alterius," the notion that when certain persons or things are designated "there is an inference that all omissions should be understood as exclusions." 2A SUTHERLAND'S STATUTORY CONSTRUCTION § 47.22 (5th ed.1992). Yet, the words of a statute must be viewed in context. *See Carter*, 409 U.S. at 420, 93 S.Ct. at 604. In light of the relationship between federal, state, and other courts in the early years of this nation's history, the nature of the D.C. courts as federal courts in those early years, repeated authorization for D.C. judges to act as federal committing magistrates, longstanding practice confirmed by legislative history, as well as the purposes of the Bail Reform Act and its applicability in D.C. courts for federal defendants, there is nothing to support appellant's interpretation. The history recited makes clear that no less

---

**29.** *See* H.R. REP. No. 93–1508 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7401 ("1974 House Report").

**30.** *See* 1974 House Report, at 47–49, 1974 U.S.C.C.A.N. at 7439–41 (referring to transitions occurring in the District of Columbia as a result of the recently enacted D.C. Court Reform Act and the D.C. Self–Government and Governmental Reorganization Act, and to the fact that applying the Speedy Trial Act, which was "tailored uniquely to the problems of delay in Federal criminal cases run[s] counter to a trend of Federal disengagement from District of Columbia judicial and court administration affairs.").

**31.** *See* D.C.Code §§ 11–921 to –923 (1973) (providing D.C. Superior Court with general civil trial jurisdiction and criminal jurisdiction arising under laws applicable exclusively to the District of Columbia).

**32.** Comprehensive Crime Control Act of 1984, Pub.L. 98–473, tit. I, 98 Stat.1976 (1984).

**33.** This language remains unchanged. *See supra* n. 8. *See also* Mandatory Detention for Offenders Convicted of Serious Crimes Act, Pub.L. 101–647, tit. IX, 104 Stat. 4789, 4826 (1990) (amending other provisions of the Bail Reform Act).

**34.** *See* 1984 Senate Report, at 3, 1984 U.S.C.C.A.N. 3185.

than state officials, Article I Superior Court judges, whom Congress intended to be analogous to state court judges, are authorized to act as federal committing magistrates. *See Swain v. Pressley,* 430 U.S. 372, 375 n. 4, 97 S.Ct. 1224, 1226 n. 4, 51 L.Ed.2d 411 (1977); *Palmore,* 411 U.S. at 409, 93 S.Ct. at 1682. *See also* 28 U.S.C. §§ 1451, 2113. Contrary to appellant's interpretation of § 3041, a more rational explanation is simply that § 3041 sufficed to include a judge of a D.C. court as a "judicial officer," so long as the D.C. courts were courts of the United States, but when Congress created local D.C. courts under Article I, Congress included a definitions section that referred to "courts" as well as "persons," and identified the D.C. judges with authorization to act as federal committing magistrates. Absent any indication of Congressional intent to the contrary, and because "it would be anomalous indeed if Congress chose to carve out the District of Columbia as the sole exception to an act of otherwise universal application ... where ... the legislative purposes underlying [the Act] support its applicability in the District," *Carter,* 409 U.S. at 422, 93 S.Ct. at 605, we hold, as the district court ruled, that D.C. Superior Court judges are authorized to act as federal magistrates for purposes of releasing federal defendants, and that appellant was lawfully released under the Bail Reform Act when a judge of the D.C. Superior Court ordered his conditional release on May 11, 1991.

■ Appellant's other challenges to his Bail Reform Act conviction on sufficiency grounds are meritless. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). First, while the government has the burden to prove each element of the offense, *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970), the fact that the release order of May 11, 1991, incorrectly indicated that the penalties for failure to appear as

required were those under the District of Columbia Bail Reform Act rather than under federal Bail Reform Act, does not mean that appellant could not have been released pursuant to the federal Bail Reform Act.[35] In addition to the circumstances previously discussed, appellant was on notice that substantial penalties could be imposed if he failed to appear as ordered, and he has failed to show any prejudice as a result of being advised of the more lenient penalties applicable under the District of Columbia statute rather than the more stringent ones under the Bail Reform Act.[36] *See United States v. Bodiford,* 753 F.2d 380, 382 (5th Cir.1985); *United States v. Clemons,* 676 F.2d 124, 126 (5th Cir.1982).

■ Second, the evidence was sufficient to show that appellant knowingly and willfully failed to appear as required. The release order directed him to appear on a specific date at a particular place and time, and if he was in doubt, the order included the telephone number for the Pretrial Services Agency from which he could obtain additional information. The absence of specific information regarding the time and place that appellant was to appear before a judicial officer is irrelevant because he avoided seeking out this information, either from the Agency or his counsel. *See Weaver,* 37 F.3d at 1413. Given the sources of information available to him, as well as his failure to appear for three years and his use of an alias, a reasonable jury could find that appellant willfully failed to appear as required, notwithstanding the evidence that when he appeared at the Pretrial Services office at 9:00 a.m. on May 13, 1991, there may not have been someone immediately available to direct him to the appropriate place for appearance before a judicial officer. *See United States v. Lloyd,* 868 F.2d 447, 452 (D.C.Cir.1989); *Trice v. United States,* 525 A.2d 176, 180 (D.C.1987); *Burgos v. United*

---

**35.** *See* 18 U.S.C. § 3142(h)(2)(a).

**36.** Under the District of Columbia Bail Reform Act, D.C.Code § 23–1327 (1994), for failure to appear for a felony charge, appellant would have been subject to a fine of not more than $5,000and imprisonment for not less than one year and not more than 5years. By contrast, under the Bail Reform Act, 18 U.S.C. § 3146(b)(1)(A)(I), and 18 U.S.C. § 3571(b)(3) (Supp.1996), for failure to appear for a felony charge, appellant would have been subject to a fine of not more than $250,000 or imprisonment for not more than ten years, or both.

States, 404 A.2d 532, 535 (D.C.1979); *Raymond v. United States,* 396 A.2d 975, 978 (D.C.1979).

### .V.

Appellant's remaining contentions require little discussion.

■ FED.R.EVID. 403: reference to "prior investigation". The district court did not abuse its discretion in declining to exclude testimony by one of the undercover officers that he recognized appellant because of a "prior investigation." *United States v. Neville,* 82 F.3d 1101, 1107 (D.C.Cir.1996); *Tarantino,* 846 F.2d at 1413; *United States . v. Carter,* 445 F.2d 669, 673 (D.C.Cir.1971), *cert. denied,* 405 U.S. 932, 92 S.Ct. 988, 30 L.Ed.2d 806 (1972); *Hardy v. United States,* 343 F.2d 233, 234 (D.C.Cir.1964), *cert. denied,* 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965). The solitary reference was ambiguous, and appellant can point to no attempt by the government to make further use of this testimony. Thus, even if the comment were deemed to be other crimes evidence, appellant has failed to show prejudice. *See Old Chief v. United States,* 136 U.S. 574, 117 S.Ct. 644, —— L.Ed.2d —— (1997).

■ **Refusal to depart downward.** The district court denied appellant's request for a downward departure in his sentence due to the more severe conditions of confinement to which he would be subject as a deportable alien. *See United States v. Smith,* 27 F.3d 649, 655 (D.C.Cir.1994). In so doing, the district court stated:

> I'm persuaded that there was an assumption of risk when he came to the United States illegally, and I'm not going to authorize a departure, simply because that might make him—make prison life more difficult for him than it would be if he were legally an alien or citizen.

There is no way to read this statement without concluding that the district court was aware that it had authority to depart downward, and that it explained why it declined to do so. Because appellant has not shown that the district court failed to appreciate that it had discretion to depart, this court's review

is at an end. *United States v. Pinnick,* 47 F.3d 434, 439 (D.C.Cir.1995).

Accordingly, we affirm the judgment of conviction.